59 CCPA

**Application of David BROWN and Alfred Saffer.**

**Patent Appeal No. 8621.**

United States Court of Customs and Patent Appeals.

May 18, 1972.

William C. Long, David Dick, New York City, attorneys of record, for appellants.

S. Wm. Cochran, Washington, D. C., for the Commissioner of Patents. Fred W. Sherling, Washington, D. C., of counsel.

Before RICH, ALMOND, BALDWIN and LANE, Judges, and RAO, Judge,

---

United States Customs Court, sitting by designation.

BALDWIN, Judge.

This appeal is from the decision of the Patent Office Board of Appeals affirming the examiner's rejection of claims 7–19 in appellant's application.[1] No claims have been allowed.

### The Invention

The invention relates to catalysts for vapor phase partial oxidation of ethylene to ethylene oxide. Claims 7 and 15, the only independent claims in the case, read as follows:

7. A process for preparing a silver-supported catalyst for the improved production of ethylene oxide, said process comprising the steps of

(a) forming an aqueous solution of silver salt,

(b) immersing completely in said solution a carrier of inert, porous particles characterized by an average diameter not larger than about 3/16 inch, an average pore diameter of about 10 to 70 microns, and a surface area less than about one square meter per gram,

(c) impregnating said particles with said solution by soaking said particles therein for a period of at least about 5 minutes at a temperature of about 90° to 95°C, thereby permitting capillary action to fill effectively the pores of said particles with said solution,

(d) separating the impregnated particles from the remainder of said solution,

(e) drying the separated particles, whereby said silver salt is deposited uniformly throughout the pores of said particles, and

(f) activating the dried particles by heating them in air at a temperature sufficient to decompose the deposited silver salt. [letters (a), (b), etc. supplied.]

15. An oxygen-activated catalyst for use in the controlled catalystic [sic] oxidation of ethylene to ethylene oxide, said catalyst comprising about 5 to 25% by weight of silver, said silver being the thermal decomposition product of a pore solution-deposited silver salt uniformly distributed throughout the pores of inert, porous particles having an average diameter not larger than about 3/16 inch, an average pore diameter of from 10 to 70 microns, and a surface area less than about one square meter per gram.

Claim 8 places the temperature of step (f) at 200–300°C. Claim 9 recites that the solution formed in step (a) is 25–80% silver. Claim 10 specifies that the solution is formed in step (a) by adding silver oxide to an aqueous carboxylic acid solution. In claim 11 the carboxylic acid is lactic acid. Claim 12 adds an oxidizing agent to the solution to prevent premature reduction of the silver salt. Claim 13 adds an alkaline earth promoter to the solution. Claim 14 recites further specifics of the drying step (e). Product claims 16–19 depend on claim 15. Claim 16 recites a particle size of 1/16–3/16 inch. Claim 17 recites an apparent porosity of 48–54%. Claim 18 recites a surface area of 0.1 to 0.2 square meters. Claim 19 requires the particles to contain silica-alumina.

Appellants allege that their catalysts have both high selectivity and high productivity. Selectivity is a measure of the ability of a catalyst to prefer the partial oxidation reaction of ethylene over the total oxidation of ethylene to carbon dioxide. It is reported as the percentage of ethylene molecules oxidized which become ethylene oxide. A catalyst with high productivity produces a large amount of ethylene oxide per unit of catalyst and per unit of time.

### The References

Aries[2] produces a catalyst for oxidation of ethylene to ethylene oxide by

1. Application Serial No. 612,731, filed January 30, 1967.

2. U.S. Patent No. 2,477,435, issued July 26, 1949.

"impregnating the porous carrier with a solution of a silver salt of an organic acid and separating the excess liquid therefrom, * * * drying the impregnated carrier, then decomposing the silver salt by direct heat under controlled conditions." Aries does not describe at any length the physical characteristics of his carriers. His impregnation takes place at between about 100 and 125°C for 1–4 hours. The catalyst is activated by heating at from 300–500°C for a period of 12 to 18 hours in an inert gas. The solution employed can contain 25–75% silver salt. The preparation of the solution by adding silver oxide to a lactic acid solution is disclosed. The addition of an oxidizing agent to prevent premature reduction of the silver salt is disclosed. In his discussion of the prior art, Aries discloses the previously known method of applying the silver compound to the carrier in the form of a paste or slurry.

McClements et al. (McClements)[3] discloses a method of coating a carrier with a silver catalyst by using a paste or slurry. The silver compound paste is coated on the support, dried and then activated:

> That the silver catalyst must be activated by converting the silver oxide thermally to metallic silver is known. This is generally accomplished on commercial scale by treating the catalyst in large trays for several hours in a forced draft hot air oven at about 400°C.

McClements found improved results if the activation temperatures were only 250–340°C. McClements is also relied on for his statements about carriers:

> Any of the known carriers employed in the production of silver surface catalysts used for catalyzing olefin to olefin oxide reaction[s] may be used. Silica, fused alumina refractory materials, and beryllium oxide, including

Alusite and Alundum, of a convenient size, say ⅛″ to ½″, preferably ⅜″, may be used as the carrier.

McClements also supports the use of a barium promoter material.

Ameen[4] is primarily relied on for his discussion of the physical characteristics of carriers:

> So far as it is known, the prior art catalysts made from commercially available alumina have varying degrees of porosity which may be as much as 65% with a large number of small pores averaging in diameter about 2–30 microns. According to the present invention, the number of pores is considerably reduced and the remaining pores enlarged to diameters within the range of about 80–200 microns, preferably 100–150 microns, while maintaining a relatively high porosity of about 40–50 percent.

While he does use the word impregnate in describing his catalyst deposition process, it is clear from a reading of the whole patent that he uses a slurry coating technique. He states that his catalyst pellets "may be as large as ¼–½″ in diameter."

Hill[5] discusses both the impregnation and the slurry methods of silver deposition. He uses the impregnation method, activating the catalyst by heating in the presence of hydrogen. Hill mentions that the carrier "alundum" is a mixture of $Al_2O_3$ and $SiO_2$.

### The Rejection

All the claims were rejected under 35 USC 103 as unpatentable over Aries combined with McClements et al. and Ameen. In the examiner's opinion the Ameen and McClements patents rendered it obvious to use a support having the physical characteristics recited in the claims and to use the Aries impregnation method. The examiner also considered that it would have been obvious

---

3. U.S. Patent No. 2,831,870, issued April 22, 1958.

4. U.S. Patent No. 3,172,893, issued March 9, 1965.

5. Canadian Patent No. 592,091, issued February 9, 1960.

to activate the Aries catalysts by heating in air at a temperature within the terms of the present claims in view of McClements.

The examiner also entered a rejection of product claims 15–19 under "35 U.S.C. 102 or at least 35 U.S.C. 103" as unpatentable over any of McClements, Hill, Ameens or Aries. The examiner considered that the claims do not recite "any characteristic which is not possessed by the supported silver catalysts disclosed by the references or which is unobvious to one of ordinary skill in the art."

The board generally adopted the examiner's reasoning. It pointed out that the physical characteristics discussed by Ameen, which overlap those recited in the claims, are those of the commercially available supports employed in prior art catalysts, which it would clearly be obvious to use. The board was also of the opinion that since Aries teaches his impregnation step as a cure for some of the difficulties encountered in the slurry deposition processes exemplified by McClements, it would have been obvious to substitute the Aries impregnation step for the slurry deposition steps in the McClements process.

## Opinion

### I. The Process Claims

After a thorough review of the references of record,[6] we disagree with the examiner and the board that the proposed substitutions of activation steps would have been obvious to one of ordinary skill in the art. The Aries patent states and reiterates several times that the organic silver salt should be activated in an inert atmosphere. He warns against the use of a hydrogen atmosphere, because that decreases the selectivity of the catalyst. He most strenuously warns against the possibility of combustion:

The method of reduction is extremely important as an excessive amount of heat caused by the combustion of the organic material will result in a poor catalyst.

The only atmosphere utilized in his examples is an inert nitrogen atmosphere. In sum, the Aries patent itself teaches against the proposed combinations.

■ The solicitor argues:

The teaching of Aries that combustion should be avoided is not a warning that simple oxidation should be avoided, as interpreted by appellants (Br. 12–13). Of course, an "instance of burning" or consumption should be avoided. Moreover, the artisan of ordinary skill would be free to evaluate and question the teachings of Aries that nitrogen activation gives better results than activation in air or hydrogen. If air activation is best as argued by appellants, no reason appears as to why this would not readily be determined by the artisan of ordinary skill.

We think that Aries fairly teaches more than merely the avoidance of combustion. The cumulative effect of his repeated warnings is that unless an inert atmosphere is used, combustion or other harmful reactions will occur. Turning to the other art relied on, especially McClements, we find nothing to assuage this clear import of Aries' teachings. McClements might be taken to indicate that no harmful *combustion* occurs when silver *oxide* is exposed to 400°C in an air atmosphere. However, is the man of ordinary skill likely to conclude that because the *oxide* was not violently oxidized a *lactate* or other *organic* salt would not be? We think not, and there is nothing in this record that would indicate otherwise. The rejection of claims 7–14 is therefore *reversed*.

6. The solicitor cites other references in his brief which he alleges deal with heating organic silver salts to obtain the metallic silver. Since these references have not been relied on in the rejection at bar, we shall not consider them.

## II. *Product Claims 15–19*

■ In order to be patentable, a product must be novel, useful and unobvious. In our law, this is true whether the product is claimed by describing it, or by listing the process steps used to obtain it.[7] This latter type of claim, usually called a product-by-process claim, does not inherently conflict with the second paragraph of 35 U.S.C. § 112. In re Steppan, 394 F.2d 1013, 55 CCPA 791 (1967). That method of claiming is therefore a perfectly acceptable one so long as the claims particularly point out and distinctly claim the product or genus of products for which protection is sought and satisfy the other requirements of the statute. It must be admitted, however, that the lack of physical description in a product-by-process claim makes determination of the patentability of the claim more difficult, since in spite of the fact that the claim may recite only process limitations, it is the patentability of the *product* claimed and *not* of the recited process steps which must be established. We are therefore of the opinion that when the prior art discloses a product which reasonably appears to be either identical with or only slightly different than a product claimed in a product-by-process claim, a rejection based alternatively on either section 102 or section 103 of the statute is eminently fair and acceptable. As a practical matter, the Patent Office is not equipped to manufacture products by the myriad of processes put before it and then obtain prior art products and make physical comparisons therewith.

■ In this case, instant claims 15–19 recite that the catalyst is "oxygen-activated" and comprises silver which is a "thermal decomposition product of a pore solution-deposited silver salt * * *." We find that the examiner reasonably concluded that, in spite of those recitations, the differences between the claimed catalysts and the activated catalysts of the references are either nonexistant or merely obvious ones, and appellants have failed to show otherwise.

Comparing instant claim 15 with the McClements patent, for example, we note that an activated catalyst is therein disclosed having 12–17% silver uniformly distributed throughout the pores of inert porous alumina particles "of a convenient size, say $\frac{1}{8}''$ to $\frac{1}{2}''$, * * *." As pointed out above, McClements states that the prior catalysts have pore diameters of 2–30 microns.

Appellant contends that certain of the recited ranges are critical and that the claimed catalysts must be different from those of the references because they give different results. In support of this, appellant points to certain comparisons of results obtained from catalysts having different properties including those of the claims and catalysts made in accordance with Hill and Aries patents. The examiner did not consider appellant's data as being "truly comparative" and in his opinion "no definite conclusions can be drawn therefrom."

After a thorough consideration of all of appellants' evidence, we fully agree with the examiner's conclusions. Since the examiner treated Example I of the specification as exemplary and appellants have dealt with it in their brief, we will confine our discussion to that example rather than deal at length with each piece of evidence proffered by appellants.

Appellants cite the data in Example I as support for the proposition that the

---

7. In re Pilkington, 411 F.2d 1345, 56 CCPA 1237 (1969) ; Saxe and Levitt, Product-by-Process Claims and Their Current Status in Chemical Patent Office Practice, 42 JPOS 528, 531–32 (1960) ; *cf.* Cochrane v. Badische Anilin & Soda Fabrik, 111 U.S. 293, 4 S.Ct. 455, 28 L.Ed. 433 (1884).

10 micron lower limit of the average pore diameter is critical. In their brief,

| Avg. Pore Diam. (microns) | Silver Content (weight percent) | Particle Diam. (inches) | Selectivity (percent) |
|---|---|---|---|
| 10–15 | 10.88 | 3/16 | 73 |
| 8.9 | 9.5 | 1/4 | 65 |
| 6.5 | 9.5–10.88 | 5/16 | 62 |

The examiner pointed out that "the percentage of silver in the catalysts compared in Example I of the specification * * * was not kept constant and it is not clear how this contributed to the differences in the results." Appellants argue that the effect of the percentage of silver contained in catalysts is shown by the following information which they extract from the Hill reference:

| Hill Example No. | Silver Content | Selectivity (or Efficiency) |
|---|---|---|
| VI | "Low" | 58% |
| IV | "Medium" | 64% |
| VII | "High" | 60% |

Appellants point out that the general range of silver content disclosed by Hill is from about 7% to about 16% and then conclude:

> The conclusion is inescapable that increasing silver content within the range covered by Example I of appellants' specification will have little effect upon selectivity but only on productivity. The parameter thus demonstrated to be essential to obtaining high selectivity by Example I of appellants' specification is pore diameter and only pore diameter.

The conclusion appellants urge upon us is far from inescapable. In the first place, it is not clear where appellants get the "9.5–10.88" percent silver for the test which used catalysts having a 6.5 average pore diameter. The only thing that Example I states is that the 5/16 inch catalyst was prepared in the same manner as the 3/16 inch and 1/4 inch catalysts except for the catalyst size and the average pore diameter. Nowhere is it stated what percentage silver was on the activated catalyst. Further, the conditions used in Examples IV, VI and VII in Hill were clearly different from those employed in appellants' Example I, one notable difference being the different activation processes employed. Appellants have given us nothing from which we could conclude that Hill's results and appellants' results would correlate in spite of those differences. Finally, even accepting appellants' figures and assuming that the Hill results would correlate with appellants' results, the conclusion urged by appellants does not follow. One of the reasons argued by appellants for patentability is that their catalysts "achieve selectivities as high as 73% while the highest selectivity in any reference here of record is below 70%." Thus, in spite of the obvious importance appellants attach to a change in selectivity of three percent, they ask us to examine data which indicates that a change of about six percent in the silver content[8] results in a six percent increase in selectivity, and conclude that increasing silver content "will have little effect upon selectivity * * *." It appears to us that the opposite conclusion could be more easily reached. We need not deal with appellants' contentions concerning the effect of the changes in particle size in their Example I. Since appellants have not demonstrated that the results in Example I were not due to changes in silver content, those results prove little or nothing about the criticality of the average pore diameter. Since appellants have not otherwise established that their catalysts differ unobviously from those of the references, the rejections of claims 15–19 are affirmed.

The decision of the board is reversed as to claims 7–14 and affirmed as to claims 15–19.

Modified.

---

8. This presumes that Hill's "low" silver content is at the bottom of the 7–16% range, and that his "medium" silver content is about 13%.