Application of Donald Francis BEST, Anthony Peter Bolton and Herbert Charles Shaw.

Patent Appeal No. 77–509.

United States Court of Customs and Patent Appeals.

Oct. 13, 1977.

Richard G. Miller, New York City, attorney of record, for appellants, James C. Arvantes, Arlington, Va., of counsel.

Joseph F. Nakamura, Washington, D. C., for the Commissioner of Patents, Gerald H. Bjorge, Washington, D. C., of counsel.

Before MARKEY, C. J., RICH, BALDWIN and LANE, JJ., and FORD, J., United States Customs Court.

MARKEY, Chief Judge.

Appeal from the decision of the Patent and Trademark Office (PTO) Board of Appeals (board) sustaining rejections of claims 1–7 under 35 U.S.C. § 102 or 35 U.S.C. § 103, and claims 3–7 under 35 U.S.C. § 112, of appellants' application serial No. 347,216, filed April 2, 1973, for "Catalyst for Hydrocarbon Conversion Processes and Process for Preparing Same."[1] We affirm.

*The Invention*

The invention relates to zeolitic molecular sieve catalyst compositions useful in hydrocarbon conversion and to a process for producing them. Claim 1 is illustrative of the product claims:

1. A crystalline zeolitic aluminosilicate having a $SiO_2/Al_2O_3$ molar ratio of from 4.6 to 5.4, a face centered cubic unit cell having an $a_o$ of greater than 24.45 to 24.55A, an $Na_2O/Al_2O_3$ molar ratio of not greater than 0.25, an adsorptive capacity in the dehydrated state for oxygen of at least 26 weight per cent at 100 mm Hg oxygen pressure and %ao183°C., an ion

1. A continuation-in-part of serial No. 145,900, filed May 21, 1971.

exchange capacity of from 0.15 to 0.35 and having the essential X-ray powder diffraction pattern of zeolite Y with the proviso that the d-spacing thereof having the Miller Indices 331 is at least as great in intensity as the line thereof having the Miller Indices 533.

Claim 3 is illustrative of the process claims:

3. Process for preparing a hydrolytically-stable zeolitic aluminosilicate which comprises providing an ion-exchanged zeolite Y having the following composition in terms of mole ratios of oxides

0.75 %ao 0.9(A)$_2$O: 0.1 %ao 0.25 Na$_2$O: Al$_2$O$_3$: 4.6%ao5.4 SiO$_2$: yH$_2$O

wherein "A" represents H$^+$ or NH$_4^+$ or a mixture thereof, and wherein y has a value of from zero to nine, heating the zeolite at a temperature between 550°C. and 800°C. for a period of at least 0.25 hours in an inert atmosphere comprising sufficient steam to prevent dehydroxylation of the zeolite, removing at least a major proportion of any ammonia generated by the heated zeolite from contact with the zeolite, and cooling the steamed zeolite to a temperature below 350°C. at a rate sufficiently rapid that the cooled zeolite exhibits an X-ray powder diffraction pattern having the d-spacing corresponding to the Miller Indices, hkl, of 331 at least as strong in intensity as that corresponding to the Miller Indices 533, prior to any post-steaming ion exchange treatment.

Claim 2 is restricted to a zeolite of claim 1 with a Na$_2$O/Al$_2$O$_3$ molar ratio of less than 0.038. Claims 4–7 add further process restrictions as to starting materials or process steps. All of the claims stand or fall with claims 1 and 3.

As recognized in the prior art, crystalline zeolitic aluminosilicates with high concentrations of sodium cations do not make good hydrocarbon conversion catalysts. For this reason sodium cations are replaced with non-metallic cations such as hydrogen or ammonium. The hydrogen or ammonium cations are removed by calcination, producing a decationized zeolite. Such decationized zeolites have poor hydrothermal stability, i. e., they lose their crystallinity upon reheating after contact with water.

The process of appealed claims 3–7 is a stabilization procedure for such low-sodium zeolites wherein a thermal treatment in the presence of steam is followed by a particular cool-down step. The zeolitic compositions of claims 1–2 represent the products of the claimed process.

### The 102/103 Rejections

The references relied upon were:

| | | |
|---|---|---|
| Maher et al. (Maher) | 3,293,192 | Dec. 20, 1966 |
| Hansford | 3,354,077 | Nov. 21, 1967 |
| McDaniel et al. (McDaniel) | 3,449,070 | June 10, 1969 |
| Kerr et al (Kerr I) | 3,493,519 | Feb. 3, 1970 |
| Kerr (Kerr II) | 3,513,108 | May 19, 1970 |

All claims were rejected under 35 U.S.C. § 102 or 35 U.S.C. § 103 as unpatentable over Hansford. Claims 1–2 were additionally rejected in view of each of Maher, McDaniel, Kerr I, and Kerr II.[2]

Hansford discloses a method for producing a hydrothermally stable Y-sieve zeolite composition by calcining an ammonium zeolite Y for 2 or more hours in an atmosphere containing water vapor at a temperature of from 700°F to 1200°F (338°C–649°C). The starting material is disclosed by Hansford as having a SiO$_2$/Al$_2$O$_3$ molar ratio of 4 to 6 and a reduced Na$_2$O content of 0.6% to 2.5% by weight (appellants claim 0.1 %ao 0.25 Na$_2$O/Al$_2$O$_3$ molar ratio and disclose 2.48% by weight in example 10 of their specification). In rejecting claims 1–7 on Hansford, the examiner asserted that a major portion of any ammonia generated during calcination would inherently be removed from contact with the zeolite, because the gaseous atmosphere disclosed by Hansford was in the form of a moving stream. Also with respect to Hansford, the examiner believed the cooling rate of the zeolite after stabilization to be within the

---

**2.** The examiner rejected claims 1–7 under 35 U.S.C. § 103 as unpatentable over Kerr I, and claims 1, 2, 3, 6, and 7 under 35 U.S.C. § 103 as unpatentable over Kerr II. The board affirmed only in relation to claims 1–2 and reversed in relation to claims 3–7 over Kerr I and to claims 3, 6, and 7 over Kerr II.

terms of the appealed process claims. The claimed product being the unique result of the claimed process, the examiner, therefore, rejected both process and product claims as anticipated by Hansford, or, in any case, as obvious in view of Hansford.

In sustaining the rejection, the board added its view of Hansford.

All the positive process limitations are expressly disclosed except for the functionally expressed rate of cooling. However, there is nothing to indicate that this rate of cooling in any way differs from the normal rate resulting from removal of the heat source. Thus, the examiner's conclusion that those parameters of the resultant product which are recited in the appealed claims but are not expressly disclosed in the reference would be inherent is a reasonable one, absent convincing evidence to the contrary. Appellants have presented no such convincing evidence. No comparison has been made between appellants' process and product and the process and product disclosed in the Hansford patent. The comparative data contained in appellants' specification and in an affidavit under 37 CFR 1.132 do not relate to the reference but merely illustrate the result of deviating from appellants' process. Such deviations appear to be also outside the scope of the Hansford teaching.

## OPINION

### I. The Process Claims

The appellants urge that, because Hansford is silent on appellants' crucial cool-down step and on his apparatus, a direct comparison between the claimed process and that of Hansford is impossible. Appellants correctly state that indirect comparisons, based on established scientific principles, can validly be applied to distinguish a claimed chemical process or product from that disclosed in the prior art. *In re Blondel*, 499 F.2d 1311, 182 USPQ 294 (CCPA 1974). However, our analysis of the comparative data offered by appellants convinces us that the burden of rebutting the PTO's reasonable assertion of inherency under 35 U.S.C. § 102, or of prima facie obviousness under 35 U.S.C. § 103, has not been met.

Our reading of Hansford leads us to conclude, as did the board, that all process limitations of claim 3 are expressly disclosed by Hansford, except for the functionally expressed rate of cooling. Because any sample of Hansford's calcined zeolitic catalyst would necessarily be cooled to facilitate subsequent handling, the conclusion of the examiner that such cooling is encompassed by the terms of the appealed claims was reasonable.

The board did not specifically mention the absence of ammonia as a result of "removing at least a major proportion of any ammonia generated by the heated zeolite from contact with the zeolite," as recited in claim 3. Its affirmance of the examiner, however, carried with it a concurrence in the examiner's view that Hansford discloses a gaseous atmosphere in a "stream." In concluding that Hansford expressly disclosed all process limitations except the cooling rate, the board necessarily considered Hansford's disclosure of a gas "stream" as equivalent to a disclosure of the removal of generated ammonia from contact with the zeolite. Though appellants argued before the board and before us that Hansford is silent on the matter, they have not provided any effective argument nor submitted any evidence that a gas stream does not inherently remove generated ammonia.

This court, in *In re Swinehart*, 439 F.2d 210, 58 CCPA 1027, 169 USPQ 226 (1971), set forth the burden of proof required to overcome an inherency rejection:

[I]t is elementary that the mere recitation of a newly discovered function or property, inherently possessed by things in the prior art, does not cause a claim drawn to those things to distinguish over the prior art. Additionally, where the Patent Office has reason to believe that a functional limitation asserted to be critical for establishing novelty in the claimed subject matter may, in fact, be

an inherent characteristic of the prior art, it possesses the authority to require the applicant to prove that the subject matter shown to be in the prior art does not possess the characteristic relied on. [439 F.2d at 212–13, 58 CCPA at 1031, 169 USPQ at 229.]

This burden was involved in *In re Ludtke*, 441 F.2d 660, 58 CCPA 1159, 169 USPQ 563 (1971), and is applicable to product and process claims reasonably considered as possessing the allegedly inherent characteristics.

The proof required here relates to appellants' cool-down step. The only comparative data on the cool-down rate are found in examples 1(a) and 1(c) of appellants' specification. Those data merely establish that there may be cooling rates which are not the cooling rate functionally set forth in claim 3. Absent from the data is a comparison of X-ray diffraction patterns, the phenomenon employed in defining cooling rates. Thus the data found in the specification are insufficient to rebut the inherency rejection of the process claims.

In view of Hansford's silence on cool-down rate and on his apparatus, appellants need only have shown that the cool-down rate, for a typical laboratory-scale sample when employed in Hansford's process, would not yield a cooled zeolite with the X-ray diffraction pattern of claim 3. Appellants failed to do even that.

Appellants submitted an affidavit of Skeels,[3] the thrust of which was the assertion that, although cooling rates can vary greatly, depending on the apparatus employed and the quantity of zeolite treated, some normal cooling rates with typical laboratory equipment are much slower than that disclosed in appellants' specification and encompassed by claim 3. The Skeels

affidavit fails for lack of a showing that such normal cooling rates are not rapid enough to result in the particular X-ray diffraction pattern recited in appealed claim 3.

We affirm the board's decision upholding the rejection of process claims 3–7 as anticipated under 35 U.S.C. § 102 or as obvious under 35 U.S.C. § 103, and do not reach the rejection of claims 3–7 under 35 U.S.C. § 112.

## II. The Product Claims

Product claims 1–2 were rejected as unpatentable over each of Hansford, Maher, McDaniel, Kerr I, and Kerr II. We find it necessary to consider only Hansford.

■ Where, as here, the claimed and prior art products are identical or substantially identical, or are produced by identical or substantially identical processes, the PTO can require an applicant to prove that the prior art products do not necessarily or inherently possess the characteristics of his claimed product. See *In re Ludtke, supra.* Whether the rejection is based on "inherency" under 35 U.S.C. § 102, on "prima facie obviousness" under 35 U.S.C. § 103, jointly or alternatively,[4] the burden of proof is the same, and its fairness is evidenced by the PTO's inability to manufacture products or to obtain and compare prior art products. See *In re Brown*, 459 F.2d 531, 59 CCPA 1036, 173 USPQ 685 (1972).

In product claim 1 appellants have "fingerprinted" their crystalline zeolitic aluminosilicate by reciting six parameters, two directly compositional in nature, $SiO_2/Al_2O_3$ and $Na_2O/Al_2O_3$ molar ratios. The other parameters are the cubic unit cell size ($a_0$), the ion exchange capacity, the oxygen adsorption capacity, and the X-ray powder diffraction pattern. Hansford discloses SiO

---

**3.** The board considered the Skeels affidavit untimely and treated it as mere argument. But if the board's statement that appellants' cooling rate did not differ from "the normal rate resulting from removal of the heat source" were considered a new ground of rejection and the affidavit be considered evidence, the data presented would not rebut the inherency rejec-

tion, absent a showing of X-ray diffraction patterns for cooled zeolites.

**4.** There is nothing inconsistent in concurrent rejection for obviousness under 35 U.S.C. § 103 and for anticipation by inherency under 35 U.S.C. § 102. *In re Skoner*, 517 F.2d 947, 186 USPQ 80 (CCPA 1975); *In re Pearson*, 494 F.2d 1399, 181 USPQ 641 (CCPA 1974).

$_2/Al_2O_3$ and $Na_2O/Al_2O_3$ molar ratios within the ranges recited in claim 1, but does not specifically disclose the other parameters.

Though urging that the other parameters are the unique result of their claimed process, appellants have offered no comparison of those other parameters with the corresponding parameters of Hansford's product.

We affirm the decision of the board upholding the rejections of product claims 1–2 on Hansford and do not reach the rejections of claims 1–2 on Maker, McDaniel, Lerr I, of Kerr II.

The decision of the board is affirmed.

*AFFIRMED.*