### In the Matter of the APPLICATION OF Walter P. FITZGERALD, Jr., Beatrix Y. Sanders, and Mansour A. H. Bagheri.

### Appeal No. 79–620.

United States Court of Customs and Patent Appeals.

April 3, 1980.

Thomas H. Jones, Los Angeles, Cal., atty. of record, for appellant; George F. Smyth, Los Angeles, Cal., of counsel.

Joseph F. Nakamura, Washington, D. C., for the Commissioner of Patents; Fred W. Sherling, Washington, D. C., of counsel.

Before MARKEY, Chief Judge, RICH, BALDWIN, and MILLER, Associate Judges, and FORD,* Judge.

* The Honorable Morgan Ford, United States Customs Court, sitting by designation.

MILLER, Judge.

This is an appeal from a decision of the Patent and Trademark Office ("PTO") Board of Appeals ("board") sustaining the rejections under 35 U.S.C. § 103 of claims 34–35, 41, 50–51, and 54 on Barnes; claims 36–37 on Barnes in view of De Hart; and claims 38–39 and 52–53 on Barnes in view of Duffy. We affirm.

## BACKGROUND

### Invention

The claims are drawn to self-locking, screw-threaded fasteners in which a patch of crystallizable thermoplastic polymer is bonded to a portion of the threads, resulting in an allegedly tighter bond between the threads and those of a complementary member.

A fastener 20 is heated above the melting temperature of a thermoplastic polymer blank 22 (Fig. 1). A pressure shoe 25 forms the blank to the curvature of the threaded portion with sufficient pressure to "tack," but not allow the crests of the threads to sever the blank (Fig. 5). Initially, the blank softens and sags (Fig. 6). When completely melted the blank forms pools 28 on the bottoms of the valleys of the threads because of a surface tension phenomenon that causes the melted plastic to wet the sides of the threads (Fig. 7). The fastener with adherent melted plastic is then cooled by quenching in water and is ready for use with a complementary member. A wide range of thermoplastic polymers may be used as starting materials, including polyamides such as nylon 11, and polyesters such as a poly (alkylene phthalate) or a poly (ethylene terephthalate).

During the cooling of crystallizable thermoplastic polymers from a molten to a solid state, there is shrinkage of the plastic due to thermal contraction which may vary, depending on the particular plastic used, from about 2–5% by volume. There also is shrinkage due to crystallization. By quenching the melted plastic, the crystallization shrinkage is substantially reduced. Values of maximum crystallization shrinkage are reported in the literature for the various crystallizable thermoplastic polymers appellants contemplate using. According to appellants' specification, if the cooling rate employed is sufficient to reduce the crystallization shrinkage to about 25% or less of the maximum crystallization shrinkage of the plastic, the plastic solidi-

fies to an amorphous solid. This causes the bond between the plastic and the thread to be more adherent, so that the fastener is more tightly secured to a complementary screw-threaded member.

Claim 34 is representative:

34. A self-locking metal screw-threaded fastener comprising:

a metallic fastener element having a threaded portion;

a patch of crystallizable thermoplastic polymer having a lower crystallization rate than polyethylene directly bonded to said threaded portion;

said polymer having a maximum crystallization shrinkage of about 3% or higher by volume, and

said polymer in said patch having a reduced degree of crystallization shrinkage of about 25% or less of its maximum crystallization shrinkage.

Claims 36–37 incorporate particles of metal, such as aluminum, into the plastic for the purpose of increasing the strength of the bond.

Claims 38–39 and 52–53 specify that the plastic is poly (alkylene phthalate) or poly (ethylene terephthalate).

### Prior Art

*Barnes* (U.S. patent 3,830,902) discloses a method and apparatus for making self-locking, internally-threaded fasteners in which the self-locking characteristic is derived from a plastic patch adhered to the threads of each fastener by depositing plastic powder upon the threads and heating the fastener to fuse the powder to the fastener threads. The molten plastic is cooled by natural convection of the ambient air and may be enhanced by blowing cool air onto the threads through a perforated air pipe. In instances where more intensive cooling is required, such as when temperatures may be higher and there is a tendency for heat to be retained in the metal body, a water trough may be used to contact the fastener and carry away excess heat. Numerous plastics may be used as starting materials, including polyamides such as nylon 11.

*De Hart* (U.S. patent 3,351,504) discloses a method of bonding plastic materials to metal surfaces by spraying heated metal with thermoplastic powder mixed with a metal powder, such as aluminum. The metal surface is pretreated by cleaning with an oxidizing agent such as chromic acid, resulting in a stronger bond. An example is also shown in which the pretreatment step is omitted, i. e., the bond is formed simply by mixing the metal powder with the plastic prior to melting.

*Duffy* (U.S. patent 3,498,352) discloses a self-locking fastener having a strongly-adhered, convexly curved plastic body on its threaded surface. The plastic may be a polyamide or polyester resin.

### Board

In considering the rejection on Barnes alone (claims 34–35, 41, 50–51, and 54), the board stated that appellants' claims are not directed to the method of making the fastener but rather are directed to the fastener *per se*, and the fact that Barnes does not disclose the *exact* method practiced by appellants in producing their fastener is of no moment. It noted that Barnes set forth the following as an object of his invention: "to permit a sufficient number of re-uses of the fastener with adequate locking torque to qualify the fastener as a reusable self-locking fastener." It reasoned that if the heating and cooling in Barnes' method produces a fastener satisfying the object of Barnes (which is commensurate with appellants'), it must inherently produce a fastener wherein the plastic possesses the shrinkage characteristics claimed by appellants; and it added that there was no objective evidence to refute such a "reasonable assumption." With respect to claims 36–39 and 52–53, the board reasoned that, because appellants (improperly) based their argument for patentability on the nonapplicability of Barnes, the rejection of those claims should be sustained.

### OPINION

### Applicability of Product-by-Process Principles

The appealed claims appear to be product claims. However, appellants state:

There is no other way to produce the patch-type fasteners defined in the appealed claims except by the use of [the] specific process which is defined in the claims of U.S. patent 3,784,435—the parent application to the present divisional application. For all intents and purposes, the present claims have exactly the same meaning which they would have had if the claims had defined appellants' patch-type fasteners in terms of the steps used in the process for making the fasteners. Therefore, the suggestion of the Solicitor that product-by-process principles be applied to the facts of this case is well taken. In a discussion of product-by-process claims, this court has said:

> [W]hen the prior art discloses a product which reasonably appears to be either identical with or only slightly different than a product claimed in a product-by-process claim, a rejection based alternatively on either section 102 or section 103 of the statute is eminently fair and acceptable. As a practical matter, the Patent Office is not equipped to manufacture products by the myriad of processes put before it and then obtain prior art products and make physical comparisons therewith.

*In re Brown*, 59 CCPA 1036, 1041, 459 F.2d 531, 535, 173 USPQ 685, 688 (1972).

### Claims 34–35, 41, 50–51, and 54

It appears that the fasteners in Barnes, the PTO's primary reference, are either identical with or only slightly different from appellants' fasteners.[1] Thus, under *In re Brown, supra*, a rejection under 35 U.S.C. § 103 is indicated, and "the PTO can require an applicant to prove that the prior art products do not necessarily or inherently possess the characteristics of his claimed product. . . . Whether the rejection is based on 'inherency' under 35 U.S.C. § 102, on 'prima facie obviousness' under 35 U.S.C. § 103, jointly or alternatively, the burden of proof is the same . . . [footnote omitted]." *In re Best*, 562 F.2d 1252, 1255, 195

USPQ 430, 433–34 (Cust. & Pat.App.1977). We note that in *Best* the relevant issue was whether a functionally claimed cooldown rate was inherently disclosed by a prior art reference—not unlike the instant case in which the claimed crystallization shrinkage is asserted by appellants to be exclusively a function of the cooldown rate of the crystallizable polymer. "[W]here the Patent Office has reason to believe that a functional limitation asserted to be critical for establishing novelty in the claimed subject matter may, in fact, be an inherent characteristic of the prior art, it possesses the authority to require the applicant to prove that the subject matter shown to be in the prior art does not possess the characteristic relied on." *In re Best, supra* at 1254–55, 195 USPQ at 433 (quoting from *In re Swinehart*, 58 CCPA 1027, 439 F.2d 210, 169 USPQ 226 (1971)).

Thus the dispositive issue is whether appellants have proved that the Barnes process does not result in fasteners having the claimed crystallization shrinkage.

The board's interpretation of the Barnes process is that Barnes' cooling rate would reasonably be expected to result in a polymer possessing the claimed crystallization shrinkage. Appellants, on the other hand, argue that the Barnes process would not result in the fasteners possessing the claimed crystallization shrinkage. They describe two cooling methods: (1) a water quench, and (2) "[f]or very rapid cooling, as for fasteners of large mass and sensible heat, silicone oil cooled by dry ice . . ." Barnes discloses three cooling methods: (1) natural convection, (2) forced air, and (3)—

> In some instances, more intensive cooling is required. For example, where plated nuts are processed by the apparatus, temperatures may be higher and there is a tendency for heat to be retained within the nut body. In these instances a water trough 316 . . . may be located beneath the path of travel of the pins and the nuts thereon and cooling water 318 may be circulated through the trough 316

---

1. Both fasteners possess the same utility, employ the same crystallizable polymer (nylon 11), and have an adherent plastic patch formed by melting and then cooling the polymer.

to contact the surface of each nut . . and carry away excess heat.

It is clear from the *example* in method (3) that, after Barnes' fasteners are heated and fused with the polymer, they travel over a lengthy path before reaching the water trough; moreover, once the fasteners reach the trough, subsequent cooling is accomplished by contacting the surface of the fasteners rather than by quenching. Thus, the most rapid cooling rate exemplified in Barnes for "more intensive cooling" would not appear to be as rapid as the slowest cooling rate disclosed by appellants. However, the record provides no comparison between the cooldown rates of Barnes and the claimed cooldown rates, expressed in objective terms, such as degrees of cooldown per second; also, Barnes emphasizes that the embodiments of his invention set forth in the specification are "provided by way of example only" and are "not intended to restrict the invention." Moreover, the issue is not whether the cooling rates are different, but whether appellants have shown that the Barnes cooling rate does not result in crystallization shrinkage of about 25% or less of its maximum crystallization shrinkage. There is no showing that a Barnes fastener, even if cooled at a slower rate than appellants', would not be cooled rapidly enough to achieve 25% or less of its maximum crystallization shrinkage.

Appellants state that there is no way in which objective evidence could be used in the present situation, because the "Barnes patent does not set forth a precise 'Example' in the nature of a chemical experiment." However, Barnes is clearly an enabling disclosure. Appellants disclose that "[t]he phenomenon of crystallinity in polymers is well understood" and that "it can be determined precisely whether the polymer patch has 'a reduced degree of crystallization shrinkage of about 25% or less of its maximum crystallization shrinkage,'" using conventional experimental techniques. In view of the admitted conventionality of this testing, we are satisfied that a comparison of the degree of crystallization shrinkage of the claimed fasteners with the crystallization shrinkage of fasteners produced by the Barnes process (under normal operating conditions) would be objective as well as probative of patentability in this situation. Accordingly, we hold that appellants have not met their burden of proof.

### Claims 36–37

Claims 36–37 additionally require incorporation of particles of metal, such as aluminum, into the polymer in an amount sufficient to increase the bond strength between the polymer and the fastener. De Hart expressly discloses mixing a metal powder (including aluminum, silver, copper, iron, and others) with a bonding plastic in the ratio of about one part metal powder to nine parts plastic powder by volume for the purpose of creating a very resistant bond "even under the action of boiling water for prolonged periods." In his Example 1, the metal powder is mixed with the plastic without a pretreatment step for the purpose of comparing pretreated and nonpretreated bonded surfaces. Because his teaching that mixing metal powder with the plastic prior to melting to form a bond was known in the prior art, the PTO has established a prima facie case. Appellants have not rebutted the prima facie case with proof of some unexpected property, such as a surprising bond strength of the claimed fasteners compared to the bond strength in the nonpretreated Example 1 of De Hart.

### Claims 38–39 and 52–53

Claims 38–39 and 52–53 require that the thermoplastic polymer be a poly (alkylene phthalate) or a poly (ethylene terephthalate). Appellants object that "[b]ecause of the requirement by Duffy that a heat-softenable resin primer or tying agent must first be applied to the fastener to provide a wetted surface . . . the Duffy patent is not logically combinable with the disclosure of the Barnes patent." However, although the Duffy process does require a pretreatment using other materials, Duffy also discloses that polyamide resins (expressly including nylon 11, also used by both Barnes and appellants) and polyester resins

may be used to form the main body of the patch for a screw-threaded fastener. Accordingly, we are persuaded that to use a polyester resin, such as a poly (alkylene phthalate) or a poly (ethylene terephthalate) as the main patch material in any plastic patch-type fastener, including the Barnes fasteners, would have been obvious from Duffy's treatment of these two classes of compounds as equivalents.

In view of all the foregoing, the rejections of claims 34–39, 41, and 50–54 are *affirmed*.

*AFFIRMED*.