**PARKE, DAVIS & CO. v. AMERICAN CYANAMID CO. et al.**

**No. 11719.**

United States Court of Appeals
Sixth Circuit.

Oct. 30, 1953.

C. B. Zewadski, Detroit, Mich. (Whittemore, Hulbert, & Belknap, Detroit, Mich., on the brief), for appellant.

L. A. Watson, New York City (Harness, Dickey & Pierce, Arthur W. Dickey, Paul Marco, Detroit, Mich., Watson, Johnson, Leavenworth & Blair, John C. Blair, John T. Kelton, New York City, Harvey W. Edelblute, Stamford, Conn., on the brief), for appellees.

Before ALLEN, MARTIN and MILLER, Circuit Judges.

ALLEN, Circuit Judge.

This is a patent infringement suit based upon Patent No. 2,407,096 for antianemia vitamin products. Both claims of the patent are involved and are printed in the margin.[1] The District Court

---

1. 1. A compound of the class consisting of an organic acid, its salts and its esters, said acid being the acid derived by autolysis of mammalian liver tissue and being free from pantothenic acid and the antipernicious anemia principle obtainable from said liver tissue, and containing the elements carbon, hydrogen, oxygen, and nitrogen, having in .005 N sodium hydroxide solution ultraviolet absorption maxima very close to the wave lengths 256 m$\mu$, 282 m$\mu$, and 365 m$\mu$, with

$$\frac{1\%}{E\,1\,cm.}$$

of approximately 542, 531, and 194 respectively, and absorption minima very close to the wave lengths 235 m$\mu$, 268 m$\mu$, and 333 m$\mu$, with

$$\frac{1\%}{E\,1\,cm.}$$

of approximately 299, 476, and 135 respectively, showing birefringence between crossed Nicol prisms when in its microcrystalline form and being colored yellowish orange in its amorphous form, both of said forms darkening and charring without melting upon heating, being relatively insoluble in cold water, much more soluble in hot water, readily soluble in glacial acetic acid and pyridine, and giving negative reactions in the biuret, murexide and Molisch tests and exercising an antianemia vitamin effect in chicks suffering from a deficiency of said acid and a growth-stimulating effect on lactobacillus casei.

2. An organic acid containing the elements carbon, hydrogen, oxygen, and nitrogen, said acid being the acid derived by autolysis of mammalian liver tissue and being free from pantothenic acid and the antipernicious anemia principle obtainable from the liver tissue, having in .005 N sodium hydroxide solution ultraviolet absorption maxima very close to

sustained a motion for summary judgment without opinion or findings of fact and held the claims not infringed by appellees' product for the reasons stated in the motion for summary judgment. The pertinent part of the motion reads as follows:

Grounds for the motion are that the claims of the patent in suit are not infringed by defendants' synthetic folic acid product for the following reasons:

1. The claims do not cover a product obtained by synthesis from discrete chemical compounds of known chemical structure by a method unrelated to and patentably different from the method described in the patent suit because:

(a) The patent specification discloses that the patented product (the chemical structure of which was unknown to the applicants) could be obtained only from a natural animal source.

(b) The patent specification states the broad aspects of the invention in terms limiting the invention to obtentions from natural animal sources in the statement:

"The above and other objects of the invention are attained by following the example [obtaining the product from hog liver] given below. The example is presented by way of illustrating the invention which, in its broader features, embodies use of other similar materials and equivalent procedures mentioned herein or which will occur to those skilled in the art."

(c) The procedure set forth in the patent in suit to obtain the product claimed by the patent has never been and is not susceptible of being commercially practiced.

(d) At the filing date of the application for the patent in suit, it was not known by the applicants how to synthesize from chemical substances of known structure a compound having the chemical, physical or biological characteristics of the product purported to be claimed in the patent in suit nor whether such a compound could ever be obtained except from a natural animal source.

2. The claims of the patent in suit are expressly limited to a product derived by autolysis [or equivalent procedure] of mammalian liver [or similar materials] by reason of the following claim language:

"said acid being the acid derived by autolysis of mammalian liver tissue and being free from pantothenic acid and the antipernicious anemia principle obtainable from said liver tissue, * * *."

3. Plaintiff is estopped to deny such limiting effect of the foregoing language in the claims in suit for the reason that claims not so limited were rejected and refused by the Patent Office and thereafter such limitations were introduced into the claims to avoid the earlier grounds of rejection and refusal and to obtain allowance of the patent.

4. Defendants' alleged infringing product has been made only by synthesis from discrete chemical compounds of known chemical structure [not from autolyzed mammalian liver, or its equivalent] by one or the other of two processes independently discovered [not involving

the wave lengths 256 m$\mu$, 282 m$\mu$, and 365 m$\mu$, with

$$\frac{1\%}{E} \quad 1 \text{ cm.}$$

of approximately 542, 531 and 194 respectively, and absorption minima very close to the wave lengths 235 m$\mu$, 268 m$\mu$, and 333 m$\mu$, with

$$\frac{1\%}{E} \quad 1 \text{ cm.}$$

of approximately 299, 476 and 135 respectively, showing birefringence between crossed Nicol prisms when in its microcrystalline form and being colored yellowish orange in its amorphous form, both of said forms darkening and charring without melting upon heating, being relatively insoluble in cold water, much more soluble in hot water, readily soluble in glacial acetic acid and pyridine, and giving negative reactions in the biuret, murexide and Molisch tests and exercising an antianemia vitamin effect in chicks suffering from a deficiency of said acid and a growth-stimulating effect on lactobacillus casei.

the steps described in the patent in suit, or their equivalent], namely, a process disclosed and claimed by U. S. Patent 2,500,296, filed July 23, 1945 and issued March 14, 1950, or a process disclosed and claimed by U. S. Patent 2,443,165, filed October 4, 1946 and issued June 8, 1948, both of said patents being owned by defendant American Cyanamid Company.

The courts are reluctant to decide important issues by summary judgment because of the lack of a record adequate to explain the issues of fact and law, Estepp v. Norfolk & Western Ry. Co., 6 Cir., 192 F.2d 889. But here the issues are clarified by extensive interrogatories filed by both parties and answered fully. Also appellant agrees that there are no issues of fact involved in the specific grounds stated in the motion for summary judgment. Since the action is for infringement the validity of the patent is not involved but its scope is sharply in issue.

It appears from the interrogatories and the answers thereto that appellees' product is a chemical compound identical with that described in the patent but that it is made from different starting materials and by an entirely different process from the product of appellant. The controlling question is whether the claims are so limited by the specification, the file wrapper proceedings and their own language that they do not cover appellees' product. The critical phrase, which is identical in each claim, is "said acid being the acid derived by autolysis of mammalian liver tissue." It is admitted that appellees' product is not derived from mammalian liver tissue nor from any animal product. It is obtained by synthesis from discrete chemical compounds of known chemical structure by a method unrelated to the method described and originally claimed in the patent.

We think the District Court correctly concluded that there is no genuine issue as to any material fact and that the claims of the patent do not cover appellees' products.

The specification of appellant's patent, in light of which the claims must be interpreted, Schriber-Schroth Co. v. Cleveland Trust Co., 311 U.S. 211, 217, 312 U.S. 654, 61 S.Ct. 235, 85 L.Ed. 132, emphasizes the fact that the appellant's product is to be obtained from animal sources. It states:

"The new product in its acid form can be obtained from various animal sources. For example, it can be obtained from animal glandular tissues such as mammalian liver, or from kidney tissue. It is essential for the growth of bacteria and is also required for growth of the animal organism, yet it can be shown to be a different product from the known vitamins isolated from natural sources.

\* \* \* \* \* \*

"Further objects of the invention are practical processes for the treatment of animal tissues whereby the new products are separated and concentrated economically."

The specification gives but one example of how to obtain appellant's product. The starting material is 6,000 pounds of hog liver which have been frozen fresh and allowed to thaw a day or two at room temperature, producing an acid by autolysis. The specification further states:

"In carrying out the process, any suitable crude aqueous animal glandular extract, such as liver or kidney extract, may be used as starting material. Even liver press juices may be used.

"We have also found it preferable to freeze the glandular tissue and then thaw it out before extracting it. By allowing the frozen tissue to stand for a considerable time, such as a week or a month, or even longer, if desired, good yields are obtainable by immediately extracting the tissue as soon as it has thawed out.

"Regardless of whether the freezing or application of similar treatment for rupturing the cells of the glandular tissue is used, the autolytic treatment is of great practical value for obtaining good yields of vitamin product."

The file wrapper proceedings in the Patent Office show that appellant originally filed nine claims, the first four being process and the last five being product claims. All of them were rejected by the Patent Office, which said as to product claims 5 to 9:

"Claims 5 to 9 are further rejected as failing to define the product properly as these claims fail to set out the product either in terms of its constitution or of the process steps by which it is obtained."

The appellant then cancelled claims 1 to 4 and product claim 9. It asked reconsideration of the remaining claims but the Patent Office again rejected claims 5 to 8 in the following language:

"Claims 5–8 are again rejected as indefinite in failing to define the product properly. * * * The expression 'obtainable' in claims 5–7 is objectionable as merely stating a possibility."

In response to this second rejection the appellant cancelled the phrase that the product was "obtainable from" and substituted a statement that it was "a constituent of" mammalian liver tissue. The Patent Office rejected all of the claims a third time. The appellant then cancelled all prior claims and substituted two new product claims which were identical with those allowed in the Patent Office as issued except that each claim stated "said acid being derivable by autolysis from mammalian liver tissue." The Patent Office thereupon rejected the claims for a fourth time, stating with reference to the term "derivable":

"Furthermore, 'derivable' is objectionable because it does not state in positive terms the method of producing the acid. * * * The term 'derivable' does not limit its method

production to autolysis but implies that other process, as yet unknown and undisclosed, may also produce the material. There is no basis for such broad terminology in the specification. 'Derivable' should be changed to 'derived.'

*     *     *     *

"This rejection is MADE FINAL."

In response to this action the appellant amended the two claims to change the term "derivable" to "derived." This constituted a limitation on the claims suggested by the Patent Office and acquiesced in by the patentee. The appellant therefore is estopped to deny the limiting effect of the language in the claims because these limitations were adopted to avoid the earlier grounds of rejection and refusal and to obtain allowance of the patent. Shepard v. Carrigan, 116 U.S. 593, 598, 6 S.Ct. 493, 29 L.Ed. 723; I. T. S. Rubber Co. v. Essex Rubber Co., 272 U.S. 429, 433–434, 47 S.Ct. 136, 71 L.Ed. 335; Smith v. Magic City Kennel Club, Inc., 282 U.S. 784, 790, 51 S.Ct. 291, 75 L.Ed. 707.

The contention that the appellant made no amendment in this application that would in any way restrict the claims because of its statement that "It should be noted, however, that the amended claims are not limited to the method but cover the product per se whether made by this or any other method" is without merit. An applicant cannot qualify the effect of his acquiescence in the rejection of a claim by stating to the Patent Office that it is not an acquiescence and that he expects to insist upon his right to cover the same ground which the rejected claim covered under other and amended claims. As declared by this court through Chief Justice Taft, then Presiding Judge, in Thomas v. Rocker Spring Co., 6 Cir., 77 F. 420, 431–432, an applicant "cannot thus destroy the effect of a patent-office ruling."

The judgment of the District Court is affirmed.