ATLANTIC THERMOPLASTICS CO.,
INC., James B. Sullivan and Richard
B. Fox, Plaintiffs–Appellants,

v.

FAYTEX CORPORATION,
Defendant/Cross–
Appellant.

Nos. 91–1076, 91–1095.

United States Court of Appeals,
Federal Circuit.

July 13, 1992.

Rehearing In Banc Denied.

For concurring opinion on denial of rehearing in banc see 974 F.2d 1037.

For dissenting opinion on denial of rehearing, see 974 F.2d 1287.

Jack R. Pirozzolo, Willcox, Pirozzolo & McCarthy, Boston, Mass., argued for plaintiffs-appellants. With him on the brief was Richard L. Binder.

Anthony M. Lorusso, Lorusso & Loud, of Boston, Mass., argued for defendant/cross-appellant. With him on the brief was Thomas M. Sanders. Of counsel were John F. Bomster, Alder, Pollock & Sheehan, Inc., Providence, R.I. and George A. Loud, Arlington, Va.

Before ARCHER, MICHEL, and RADER, Circuit Judges.

RADER, Circuit Judge.

Atlantic Thermoplastics owns U.S. Patent No. 4,674,204 ('204 patent) entitled "Shock Absorbing Innersole and Method of Preparing Same." Atlantic sued Faytex Corporation[1] for infringing the '204 patented process with innersoles manufactured by two separate processes. After a bench trial, the United States District Court for the District of Massachusetts held that Faytex infringed the '204 patent by selling innersoles manufactured by Surge, Inc. The court held, however, that Faytex did not infringe the '204 patent by selling innersoles manufactured by Sorbothane, Inc. *Atlantic Thermoplastics Co. v. Faytex Corp.*, No. 88–0210–H (D.Mass. July 27, 1990). The trial court also determined that the '204 patent is not invalid under the on-sale bar of 35 U.S.C. § 102(b) (1988).

This court affirms the district court's infringement determination. Because unable to determine whether the district court applied the correct legal standards under section 102(b), this court vacates the district court's judgment as to validity and remands for findings on the on-sale issue. Because the trial court improperly determined damages, this court also remands for recalculation of lost profits, if liability is again established.

## BACKGROUND

The '204 patent contains both process claims and product-by-process claims for a shock absorbing shoe innersole. The innersole is formed in a mold having a contoured heel and arch section. Two different materials combine to make the innersole: an elastomeric material in the heel section, and a polyurethane foam. The elastomeric heel insert enhances shock absorption. The polyurethane foam forms around the heel insert and supplies the rest of the innersole.

Claim 1 of the '204 patent defines the process:

> In a method of manufacturing a shock-absorbing, molded innersole for insertion in footwear, which method comprises:
>
> (a) introducing an expandable, polyurethane into a mold; and
>
> (b) recovering from the mold an innersole which comprises a contoured heel and arch section composed of a substantially open-celled polyurethane foam material, the improvement which comprises:
>
> (i) placing an elastomeric insert material into the mold, the insert material having greater shock-absorbing properties and being less resilient than the molded, open-celled polyurethane foam material, and the insert material having sufficient surface tack to remain in the placed position in the mold on the introduction of the expandable polyurethane material so as to permit the expandable polyurethane material to expand about the insert material without displacement of the insert material; and

---

1. Faytex makes numerous requests for sanctions under Fed.Cir.R. 38 and under 35 U.S.C. § 285 (1988). Section 285 does not permit sanctions except in exceptional cases. Faytex is the accused infringer and thus, cannot accuse Atlantic of willful infringement. Faytex does not allege that Atlantic brought or conducted its suit in bad faith. In any event, this court does not consider Atlantic's appeal frivolous. Faytex's sanction requests lack merit. Unfounded requests for sanctions are themselves frivolous and sanctionable.

(ii) recovering a molded innersole with the insert material having a tacky surface forming a part of the exposed bottom surface of the recovered innersole.

Faytex distributes half-sole innersoles, or heel cups, with an elastomeric heel insert. Two different manufacturers—Surge Products and Sorbothane—make Faytex's innersoles. The Surge process for making innersoles differs from the Sorbothane process. Surge first manually places a solid elastomeric insert into the heel section of the innersole mold. Surge then injects polyurethane around the solid heel insert to form the innersole. Sorbothane, on the other hand, first injects a liquid elastomeric precursor into the mold, which solidifies to form the heel insert. While the heel insert is solidifying, Sorbothane injects polyurethane into the same mold to form the rest of the innersole.

The parties agree that the Surge process infringes the '204 patent. The district court concluded that the Sorbothane process did not infringe the '204 patent. The district court read the claims to require placement of a solid elastomeric insert into the mold. This reading leaves injection of liquid elastomers outside the scope of the claims. Atlantic contests this construction.

Because Faytex does not manufacture the innersoles, Atlantic cannot charge Faytex with infringement of the process claims. However, claim 24 of the '204 patent states: "The molded innersole produced by the method of claim 1." Atlantic argues that Faytex, by distributing products allegedly made by the claimed process, is liable as an infringer. Faytex cross-appeals from the award of lost profit damages for the sale of Surge and Sorbothane innersoles. Faytex also appeals the district court's determination that the '204 patent is not invalid under the on-sale bar of 35 U.S.C. § 102(b).

## DISCUSSION

### I. On Sale Bar

Faytex asserts that the '204 patent is invalid because the claimed invention was on sale more than one year before the filing date of the application. Faytex bears the burden of showing invalidity under section 102(b) by clear and convincing evidence. *See Buildex Inc. v. Kason Indus.*, 849 F.2d 1461, 1462–63, 7 USPQ2d 1325, 1326–27 (Fed.Cir.1988). To prevail, Faytex had to show that Atlantic sold or offered for sale the claimed innersole before October 9, 1984. A single sale or offer to sell suffices to bar patentability. *In re Caveney*, 761 F.2d 671, 676, 226 USPQ 1, 4 (Fed.Cir.1985). This court must determine whether the district court erred in concluding that Faytex did not meet its burden.

Appellate review of an on-sale bar proceeds as a question of law. *U.S. Environmental Prods. v. Westall*, 911 F.2d 713, 715, 15 USPQ2d 1898, 1900 (Fed.Cir.1990). Thus, this court reviews the trial court's conclusion *de novo*, with factual findings underlying that conclusion subject to review for clear error. *Manville Sales v. Paramount Sys.*, 917 F.2d 544, 549, 16 USPQ2d 1587, 1591 (Fed.Cir.1990); *Moleculon Research v. CBS, Inc.*, 793 F.2d 1261, 1266, 229 USPQ 805, 808 (Fed.Cir.1986), *cert. denied*, 479 U.S. 1030, 107 S.Ct. 875, 93 L.Ed.2d 829 (1987).

To invoke the on-sale bar, a defendant must prove that the complete claimed invention is embodied in or obvious in view of the thing sold or offered for sale before the critical date. *UMC Elecs. Co. v. United States*, 816 F.2d 647, 656, 2 USPQ2d 1465, 1471 (Fed.Cir.1987), *cert. denied*, 484 U.S. 1025, 108 S.Ct. 748, 98 L.Ed.2d 761 (1988). The on-sale bar invalidates a patent for an invention offered for sale, even though not ready for satisfactory commercial marketing. *Barmag Barmer Maschinenfabrik AG v. Murata Mach.*, 731 F.2d 831, 838, 221 USPQ 561, 567 (Fed.Cir.1984). If a patent owner seeks to avoid the on-sale bar on the basis that a sale or offer was experimental, *UMC*, 816 F.2d at 657, a trial court must determine whether the patent owner sought the sale primarily for profit rather than as part of a testing program. To determine whether profit motivated a transaction, a court must examine the claimed features, *In re Smith*, 714 F.2d 1127, 1136, 218 USPQ 976, 984 (Fed.Cir.

1983), the offeror's objective intent, and the totality of the circumstances, *U.S. Environmental Products*, 911 F.2d at 716.

■ Despite the many issues affecting any application of the on-sale bar rule, the district court's sole finding in this case consists of a conclusory statement:

[Atlantic's] first offer to sell and a definite sale were made to Triangle Corporation after October 9, 1984 in January of 1985, as the invention was not commercially marketable before that time....

*Atlantic Thermoplastics*, slip op. at 26. The district court did not provide any findings of fact or analysis for its conclusion. Moreover, the district court's finding does not consider several offers to sell before October 1984. The district court apparently assumed, incorrectly, that mere offers do not trigger the on-sale bar rule. In any event, in the absence of findings, this court cannot determine whether the trial court properly considered those offers of sale and therefore applied the correct legal standard.

After a bench trial, a trial court must put forth the findings of fact relied upon to justify its actions. Fed.R.Civ.P. 52(a). Without findings, this court has no basis to evaluate whether the district court's analysis uses the proper legal standard. *Cf. Nutrition 21 v. United States*, 930 F.2d 867, 869, 18 USPQ2d 1347, 1349 (Fed.Cir. 1991) (preliminary injunction). Because the absence of findings goes to the heart of the issue, any error cannot be harmless error. Therefore, this court vacates the district court's judgment on validity and remands for a proper on-sale analysis.

## II. Infringement

The district court determined that infringement turned on the proper interpretation of two claim limitations: "placing an elastomeric insert material into the mold" and "the insert material having sufficient surface tack to remain in the placed position on the introduction of the expandable polyurethane material." *Atlantic Thermoplastics*, slip op. at 14. According to the trial court, these limitations

describ[e] a method of manufacturing innersoles by which a solid or cellular preformed elastomeric insert material is manually placed or put in the heel portion of the mold and an open-celled expandable polyurethane foam material is then injected or poured into the mold so as to expand about the solid preformed elastomeric insert material without displacement of the insert material.

*Id.* at 15. The court further held that the claim requires that the solid insert material be held in position by the inherent "tack" of the material. The trial court specifically rejected any interpretation which allowed injection of the heel insert as a liquid into the mold.

This court interprets the '204 patent claims in light of the claim language, the specification, and the prosecution history. *Hormone Research Found. v. Genentech, Inc.*, 904 F.2d 1558, 1562, 15 USPQ2d 1039, 1042–43 (Fed.Cir.1990), *cert. dismissed,* 111 S.Ct. 1434 (1991). This interpretation proceeds from the vantage point of one skilled in the art. *Smithkline Diagnostics v. Helena Labs.*, 859 F.2d 878, 882, 8 USPQ2d 1468, 1471 (Fed.Cir.1988).

The parties agree that the district court correctly determined that the Surge process includes each limitation of claim 1. Therefore, the Surge process infringes the '204 patent.

The Sorbothane process is a "two-pour" process which first injects a liquid elastomer and then a liquid polyurethane into the mold. The Sorbothane mold includes a dam which outlines the heel placement of the insert. This dam captures and confines the liquid elastomer. The dam ensures that the elastomer solidifies in place to form the heel insert. Thus, upon injection of the liquid elastomeric material, the dam—not the tack of the elastomeric material—holds the insert in place during introduction of polyurethane foam.

The district court found that the Sorbothane process did not literally infringe the '204 patent for two reasons. First, the injection of liquid elastomeric material did not fit within the "placing" limitation. As a liquid, the court determined that the in-

sert lacked the elastomeric qualities specified in the claim. Second, the district court determined that the dam, rather than the tackiness, held the insert in place in the mold. Thus, according to the district court, the Sorbothane process did not satisfy the tackiness limitation of the claim.

■ This court finds no clear error in the district court's findings that *in situ* molding of the liquid elastomeric insert material does not fit within the placing limitation. "Placing an elastomeric insert material into the mold" is a limitation in claim 1. The Sorbothane process introduces a liquid insert into a mold within the larger innersole mold. The specification repeatedly refers to the insert as a "solid or cellular material" not a liquid. Furthermore, upon introduction under the Sorbothane process, the liquid polyurethane lacks elastomeric properties. The district court's finding comports with the language used in the '204 claims. Substantial evidence from expert witnesses supports the district court's interpretation.

This court also finds no clear error in the district court's finding that the Sorbothane process does not use tackiness to hold the elastomeric insert in place during injection of the polyurethane foam.

The trial court specifically found that the "tackiness of the chemical composition has no effect on the 'Sorbothane' process, as an essential component of this process is the use of a teflon-coated mold, sprayed with mold release, designed to reduce any surface tack, thus facilitating release of the heel cup from the mold." *Atlantic Thermoplastics*, slip op. at 20. The record suggests no clear error in this finding. The teflon-coated mold and mold release of the Sorbothane process inhibit the tackiness of the solidified insert. Thus, tackiness does not hold the insert immobile during insertion and expansion of the polyurethane foam. Rather, as the district court found, the small dam in the heel section holds the elastomeric material in place during its liquid and solid states. The Sorbothane

process thus does not meet the "surface tack" claim limitation.

■ The district court also found no infringement under the doctrine of equivalents. The trial court determined that the way the Sorbothane process performed its function was substantially different from that claimed in the '204 patent. The district court found that use of a dam to hold the insert in place is substantially different from use of tack to perform the same function. This court discerns no clear error in this finding.

This court finds no basis to reverse the district court's non-infringement finding on the Sorbothane process. Therefore, this court affirms the district court's determination that Sorbothane innersoles do not infringe claim 24 of the '204 patent.

### III. Product-by-Process Claims

In the alternative, Atlantic argues that *Scripps Clinic & Research Foundation v. Genentech, Inc.*, 927 F.2d 1565, 18 USPQ2d 1001 (Fed.Cir.1991) demands reversal of the non-infringement finding, even under the district court's present interpretation of the claims. In *Scripps Clinic*, this court stated:

[T]he correct reading of product-by-process claims is that they are not limited to product prepared by the process set forth in the claims.

*Id.* at 1583. Atlantic states that the Sorbothane process results in innersoles which are indistinguishable from innersoles made by the Surge process and claimed in the '204 patent. Therefore, according to Atlantic, the Sorbothane innersoles— though made by a different non-infringing process—also infringe. In sum, Atlantic urges this court to ignore the process claim language in its product-by-process claim.

### A. Supreme Court and Regional Circuit History

■ To construe and apply the product-by-process claim of the '204 patent, this court must examine the history of products claimed with process terms.[2] This inquiry

2. This court in *Scripps Clinic* ruled without reference to the Supreme Court's previous cases

involving product claims with process limitations. In the absence of responsive briefing of

begins with several century-old Supreme Court cases.

In *Smith v. Goodyear Dental Vulcanite Co.*, 93 U.S. 486, 493, 23 L.Ed. 952 (1877), the Supreme Court construed a patent claiming a "plate of hard rubber, or vulcanite, or its equivalent, for holding artificial teeth, or teeth and gums, substantially as described." This claim was not drafted in contemporary product-by-process terms, but instead incorporated the specification. The specification, in turn, described a process for embedding teeth in soft vulcanite which later hardened to hold the artificial teeth firmly in place.[3] The Supreme Court stated that the product could not be separated from the process by which it was made:

> The invention, then, is a product or manufacture made in a defined manner. It is not a product alone separated from the process by which it is created.... The process detailed is thereby made as much a part of the invention as are the materials of which the product is composed.

*Smith*, 93 U.S. at 493. The Supreme Court concluded that both the process and the product of that process were patentable. *Id.* at 493, 494, 501.

A few years later, the same patent was again before the Supreme Court—this time in an infringement context. *Goodyear Dental Vulcanite Co. v. Davis*, 102 U.S. 222, 26 L.Ed. 149 (1880). A district court had held that a celluloid plate for artificial teeth with its differing process did not infringe the patent. The Supreme Court first quoted from its *Smith* opinion to clarify that the patent claimed both product and process. On that basis, the Supreme Court concluded:

> Hence, to constitute an infringement of the patent, both the material of which the dental plate is made, or its equivalent, and the process of constructing the plate, or a process equivalent thereto, must be employed.

*Id.* at 224. After noting that "the [celluloid] process is wholly unlike that employed in making hard rubber or vulcanite plates," *id.* at 229, the Court affirmed the district court's noninfringement decree. The Court also reasoned that the product of that process, a celluloid plate, is not "substantially the same as one made of hard rubber." *Id.*

Another Supreme Court case in this time frame illustrated the significance of claiming a product with process limitations. In *Merrill v. Yeomans*, 94 U.S. 568, 24 L.Ed. 235 (1877), the patentee of heavy hydrocarbon oils deodorized by an innovative process sued retailers. These retailers sold a product nearly identical to the patentee's oil, though deodorized by a different process. As the Supreme Court noted, if the patent claimed "a new oil," then the sellers of that product may be liable as infringers. *Id.* at 568. If, on the other hand, the patent claimed only the process, the retailers did not use that, or any other, process. *Id.*

The Court again read the process language in Merrill's specification as a limitation on the claims. *Id.* at 571. Merrill

---

the issues by the *Scripps Clinic* parties, this court noted that it was reviewing an "undeveloped record," and devoted one paragraph to resolving the jurisdictional issue and one paragraph to the merits. *Scripps Clinic & Research Foundation v. Genentech, Inc.*, 927 F.2d 1565, 1583–84, 18 USPQ2d 1001, 1015 (Fed.Cir.1991). A decision that fails to consider Supreme Court precedent does not control if the court determines that the prior panel would have reached a different conclusion if it had considered controlling precedent. *See Tucker v. Phyfer*, 819 F.2d 1030, 1035 n. 7 (11th Cir.1987). For the reasons set forth below, we necessarily so conclude.

**3.** Incorporation of the specification into the claim is contrary to current claim practice.

*See, e.g., SRI Int'l v. Matsushita Elec.*, 775 F.2d 1107, 1121, 227 USPQ 577, 585 (Fed.Cir.1985) (in banc). Under the old practice for claims with the phrase "substantially as described," the Supreme Court treated the specification as part of the claim. Thus, the specification added process limitations to the claimed product. *Smith v. Goodyear Dental Vulcanite Co.*, 93 U.S. 486, 494, 23 L.Ed. 952 (1877) ("If, then, the claim be read, as it should be, in connection with the preceding part of the specification, and construed in the light of the explanation which that gives, the invention claimed and patented is [the dental plate produced by the vulcanization process].").

argued, for good reason, against this interpretation:

> The counsel for appellant disclaim this latter construction, and allege that the patent covers the oil described, by whatever mode it may be produced. It is necessary to insist on this view, because it is made to appear in the case that the oils sold by defendants were produced by a process very different from that described by appellant.

*Id.* The Supreme Court noted that Merrill's counsel had to make that argument because defendants sold oil made by a different process. In discussing the process limitations, the Court said

> by the well-settled rules of construing all instruments, some importance must be attached to them; and, if they are to be regarded at all, they must either refer to the process of making the oils for which the applicant is claiming a patent, *or they are intended to limit his claim for a patent for the product to that product only, when produced by treating the oils in the manner before described.*

*Id.* (emphasis added). The Court concluded that Merrill claimed only a process.[4] Therefore, the retailers were not proper parties.

In *Cochrane v. Badische Anilin & Soda Fabrik*, 111 U.S. 293, 4 S.Ct. 455, 28 L.Ed. 433 (1884) (BASF), the Supreme Court considered an infringement case. *BASF* involved alizarine, a dye. BASF obtained Reissue Patent No. 4,321 covering the product, artificial alizarine, as produced by a bromine reaction process. The claim stated:

> Artificial alizarine, produced from anthracine or its derivatives by either of . the methods herein described, or by any other method which will produce a like result.

*Id.* at 296, 4 S.Ct. at 456. The Supreme Court noted, "No. 4,321 furnishes no test by which to identify the product it covers, except that such product is to be the result of the process it describes." *Id.* at 305, 4 S.Ct. at 461.[5]

Cochrane, the accused infringer, sold artificial alizarine made by a sulfuric acid reaction process. BASF sued Cochrane for infringing the 4,321 patent. The district court determined that Cochrane's product made by a sulfuric process infringed the 4,321 patent. The circuit agreed. Before the Supreme Court, BASF contended that Cochrane infringed because it made artificial alizarine "from anthracine or its derivatives *by some method.*" *Id.* at 309, 4 S.Ct. at 463 (emphasis added). BASF argued that Cochrane made artificial alizarine; therefore, the process did not matter. *Id.* at 310, 4 S.Ct. at 464. The Supreme Court disagreed.[6]

Instead, the Supreme Court enunciated a rule for products claimed with process limitations:

> Every patent for a product or composition of matter must identify it so that it

---

4. This case suggests, however, that product-by-process claims may serve to bring retailers within the scope of an infringement action. Indeed in the case at bar, Atlantic Thermoplastics has sued Faytex, a retailer, under the product-by-process claims of the '204 patent.

5. The court construed the seemingly broad language "by any other method *which will produce a like result*" as being limited to "any process substantially the same" as the two methods described in the specification (presumably the cause of the underlined phrase). *Cochrane v. Badische Anilin & Soda Fabrik*, 111 U.S. 293, 296, 305–06, 4 S.Ct. 455, 456, 461–62, 28 L.Ed. 433 (1884) (emphasis added) (BASF).

6. In reversing, the Supreme Court observed that Cochrane sold "alizarine ... which was not made by the process described in No. 4,321, or any process substantially the same." *BASF*, 111 U.S. at 296, 4 S.Ct. at 456; *see also id.* at 305–06, 4 S.Ct. at 461–62. Cochrane's "bisulpho-acid

process" produced artificial alizarine, but in a different form from the bromine process of the 4,321 patent. *Id.* at 305, 4 S.Ct. at 461. BASF continued to argue, however, that its patent embraced all forms of artificial alizarine. To this the Supreme Court responded that because artificial alizarine can take different forms, BASF's claim would be indefinite unless limited to the described process:

> [U]nless it is shown that the process of No. 4,321 was followed to produce the defendants' article, or unless it is shown that that article could not be produced by any other process, the defendants' article cannot be identified as the product of the process of No. 4,321.... If the words of the claim are to be construed to cover all artificial alizarine, whatever its ingredients, ... we then have a patent for a product or composition of matter, which gives no information as to how it is to be identified.

*Id.* at 310, 4 S.Ct. at 464.

can be recognized aside from the description of the process for making it, or else nothing can be held to infringe the patent which is not made by that process. *Id.* at 310, 4 S.Ct. at 464. Based on this standard, the Supreme Court held the claim of the 4,321 patent not infringed because the defendants had used a different process.

After stating this rule for claim construction, the Supreme Court offered an alternative "view of the case." *BASF,* 111 U.S. at 311, 4 S.Ct. at 464. BASF's artificial alizarine was an "old article." *Id.* In the words of the Supreme Court, "While a new process for producing it was patentable, the product itself could not be patented, even though it was a product made artificially for the first time." *Id.; see also The Wood–Paper Patent,* 90 U.S. 566, 596, 23 L.Ed. 31 (1874). In other words, a patent applicant could not obtain exclusive rights to a product in the prior art by adding a process limitation to the product claim. A new process, although eligible for a process patent, could not capture exclusive rights to a product already in the prior art. Therefore, BASF could have claimed a new process for making artificial alizarine, but it had no rights to claim the product.[7]

Thus, in *BASF,* the Supreme Court addressed both infringement and validity (in terms of patentability) of product claims containing process limitations. In judging infringement, the Court treated the process terms as limitations on the patentee's exclusive rights. In assessing validity in terms of patentability, the Court forbade an applicant from claiming an old product by merely adding a new process. The infringement rule focused on the process as a limitation; the other rule focused on the product with less regard for the process limits. A decision from the Patent Office, for instance, cited *BASF* twice—once for an infringement rule and once for a patent-

ability rule. *Ex parte Fesenmeier,* 1922 C.D. 18, 302 Off. Gaz. Pat. Office 199 (1922).

In *Plummer v. Sargent,* 120 U.S. 442, 7 S.Ct. 640, 30 L.Ed. 737 (1887), the Supreme Court reviewed two patents. One claimed an improved process for bronzing or coloring iron; another claimed the product of that process. *Id.* at 443, 7 S.Ct. at 641. After reviewing the prior art and descriptions of both patents, the Court stated:

> [I]t may be assumed that the new article of manufacture called Tucker bronze is a product which results from the use of the process described in the patent, and not one which may be produced in any other way. So that, whatever likeness may appear between the product of the process described in the patent and the article made by the defendants, their identity is not established unless it is shown that they are made by the same process.

*Id.* at 448, 7 S.Ct. at 643. After finding it "difficult, if not impossible" to discern differences between the accused product and the product claimed with process limitations, the Court concluded that "the two processes differ." *Id.* at 449, 7 S.Ct. at 644. Accordingly, the Court affirmed the circuit court's noninfringement ruling. *Id.* at 450, 7 S.Ct. at 644.

In *General Electric v. Wabash Appliance,* 304 U.S. 364, 58 S.Ct. 899, 82 L.Ed. 1402 (1938), the Supreme Court considered a product claim for a filament in incandescent lamps. Under R.S. 4888 (the forerunner of the current 35 U.S.C. § 112 (1988)), the Supreme Court determined that the claim did not adequately describe the invention. *General Elec.,* 304 U.S. at 368, 58 S.Ct. at 901. In reviewing the claim, the Court considered whether the process described in the specification made the claim

---

**7.** The United States Court of Claims followed *BASF*'s rule in *Tri–Wall Containers v. United States,* 408 F.2d 748, 161 USPQ 116 (Ct.Cl.), *cert. denied,* 396 U.S. 828, 90 S.Ct. 78, 24 L.Ed.2d 79 (1969):

> [T]he addition of a method step in a product claim, which product is not patentably distinguishable from the prior art, cannot impart patentability to the old product.

*Id.* at 750–51. In adopting the opinion of one of its trial commissioners, the Court of Claims ensured that an applicant who seeks rights only to a new process may not validly claim an old product. The applicant could only claim rights to a new process.

more definite. In that context, the Court stated:

> Although in some instances a claim may validly describe a new product with some reference to the method of production, a patentee who does not distinguish his product from what is old except by reference, express or constructive, to the process by which he produced it, cannot secure a monopoly on the product by whatever means produced.

*General Elec.*, 304 U.S. at 373, 58 S.Ct. at 904 (footnote omitted). At that point, the Court quoted from *BASF:* "nothing can be held to infringe the patent which is not made by that process." *Id.* at 373–74, 58 S.Ct. at 904.

Thus, the Supreme Court stated in a line of cases that the infringement inquiry for product claims with process limitations focuses on whether the accused product was made by the claimed process or its equivalent. In reviewing for infringement, the regional circuits followed the rule that the process limits a product-by-process claim. For instance, in *Hide–Ite Leather v. Fiber Products*, 226 F. 34 (1st Cir.1915), the United States Court of Appeals for the First Circuit affirmed the trial court's non-infringement holding because the accused product was not made by the claimed process or its equivalent. The First Circuit stated:

> It is also a well-recognized rule that, although a product has definite characteristics by which it may be identified apart from the process, still, if in a claim for the product it is not so described, but is set forth in the terms of the process, nothing can be held to infringe the claim which is not made by the process.

*Id.* at 36; *see also Paeco, Inc. v. Applied Moldings*, 562 F.2d 870, 876, 194 USPQ 353, 358 (3d Cir.1977); *United States Gypsum Co. v. Consolidated Expanded Metal Cos.*, 130 F.2d 888, 893, 55 USPQ 247, 252 (6th Cir.), *cert. denied*, 317 U.S. 698, 63 S.Ct. 441, 87 L.Ed. 558 (1943); *Buono v. Yankee Maid Dress Corp.*, 77 F.2d 274, 279, 26 USPQ 57, 61 (2d Cir.1935); *Downes v. Teter–Heany Dev. Co.*, 150 F. 122, 124 (3d Cir.), *cert. denied*, 205 U.S. 543, 27 S.Ct. 790, 51 L.Ed. 922 (1907).

In *Parke, Davis & Co. v. American Cyanamid Co.*, 207 F.2d 571, 572, 99 USPQ 237, 238 (6th Cir.1953), the patentee's product claim included a process limitation: "said acid being the acid derived by autolysis of mammalian liver tissue." The Sixth Circuit determined that a synthetic folic acid process did not infringe the claimed extraction process. *Id.* Likewise, the Seventh Circuit in *National Carbon Co. v. Western Shade Cloth Co.*, 93 F.2d 94, 97 (7th Cir.1937), *cert. denied*, 304 U.S. 570, 58 S.Ct. 1039, 82 L.Ed. 1535 (1938), stated: "It has been said that a claim for a product produced by any process which will produce a like result covers the product only when made by equivalent processes." Indeed sister circuits that examined the standard for infringement of product-by-process claims uniformly followed the Supreme Court's lead.

Commentators have generally read this line of cases to mean that, in infringement proceedings, the process in a product-by-process claim serves as a limitation. In his treatise, Donald Chisum states:

> A "product-by-process" claim is one in which the product is defined at least in part in terms of the method or process by which it is made. Most decisions hold that such a claim is infringed only by a product made through a substantially identical process....

2 D. Chisum, *Patents* § 8.05 (1991) (footnotes omitted).[8] *Lipscomb's Walker on Patents* states:

> A claim to a product by a specific process is not infringed by the same product made by a different process.

3 E. Lipscomb III, *Lipscomb's Walker on Patents* § 11:19 (3d ed. 1985). Another legal text states:

> Product-by-process claims are usually deemed infringed only by a product made by the same process.

---

**8.** Cases referred to by Chisum as supporting a contrary position involved patentability and not infringement.

1 Iver P. Cooper, *Biotechnology and the Law* § 5B.05[2] (1991). Finally, one treatise concludes:

> There is considerable case authority supporting th[e] position [that product-by-process claims cover only products made by the process specified in the claim] including a nineteenth century Supreme Court decision.
>
> [This precedent represents] a hundred years of prior law....

2 Martin J. Adelman et al., *Patent Law Perspectives* § 2.6[10] (2d ed. 1991). These commentators discerned a rule treating process terms as limitations on product-by-process claims in infringement actions.

### B. PTO and Court of Customs and Patent Appeals (CCPA)

The CCPA consistently stated the general rule that an applicant must claim an article of manufacture by its structural characteristics, not by reference to its manufacturing process. For instance, the court stated:

> This court has repeatedly held that a claim for an article capable of such definition must define the article by its structure and not by the process of making it.

*In re Johnson*, 394 F.2d 591, 594, 157 USPQ 620, 623 (CCPA 1968); *In re Lifton*, 189 F.2d 261, 89 USPQ 641 (CCPA 1951); *In re McKee*, 95 F.2d 264, 266, 37 USPQ 209, 210 (CCPA 1938). Thus, the Patent and Trademark Office's Manual of Patent Examining Procedure (MPEP) still refers to product-by-process claims as "peculiar" in comparison to products "claimed in the conventional fashion." MPEP 706.03(e) (5th ed. 1983, rev. 1989). Recognizing this rule, the CCPA contrasted product-by-process claims with "true product claims." *In re Hughes*, 496 F.2d 1216, 1219, 182 USPQ 106, 108 (CCPA 1974).

As early as 1891, the Patent Office—though recognizing the general rule—acknowledged the need for an exception:

> It requires no argument to establish the proposition that *as a rule* a claim for an article of manufacture should not be defined by the process of producing that article.... When the case arises that an article of manufacture is a new thing, a useful thing, and embodies invention, and that article cannot be properly defined and discriminated from the prior art otherwise than by reference to the process of producing it, a case is presented which constitutes a proper exception to the rule.

*In re Painter*, 57 Off. Gaz. Pat. Office 999 (1891) (emphasis in original).

For years, the PTO, with the approval of the CCPA, limited this exception to those instances where the applicant could describe an invention in no way other than in terms of its manufacturing process. *See, e.g., In re Bridgeford*, 357 F.2d 679, 149 USPQ 55 (CCPA 1966); *In re Moeller*, 117 F.2d 565, 567, 48 USPQ 542 (CCPA 1941); *Fesenmeier*, 302 Off. Gaz. Pat. Office 199. The CCPA also recognized further reasons for the product-by-process exception:

> [T]he right to a patent on an invention is not to be denied because of the limitations of the English language.... [T]he limitations of known technology concerning the subject matter sought to be patented should not arbitrarily defeat the right to a patent on an invention.

*Bridgeford*, 357 F.2d at 682. Thus, where applicants could not adequately describe their inventions in terms of structural characteristics, whether due to language lagging behind innovations or existing technology lagging behind in the ability to determine those characteristics, the court permitted product-by-process claiming.[9]

---

**9.** During this "rule of necessity" era, applicants had to justify product-by-process claims with a showing that they could not otherwise claim their invention. *See, e.g., Ex parte Tiffin*, 167 USPQ 359, 360 (Bd.App.1969). For this reason, applicants and the courts drew lines distinguishing product claims which included incidentally a process limitation from products claimed solely or primarily in process terms. *See, e.g., In re*

*Moore*, 439 F.2d 1232, 1236, 169 USPQ 236, 239 (CCPA 1971) (The structural claim included the process words "highly fluorinated." The court expressly found that these were not product-by-process claims.). In *Moore*, the product claims contained sufficient structural characteristics to define the invention even though it also contained a reference to how the product was made. *Id.; In re Steppan*, 394 F.2d 1013, 156

Circuit Judge Learned Hand explained that this exception protected inventors' exclusive rights to their inventions to the degree that they were able to define their innovation:

[I]t might be possible to patent a product merely as the product of a machine or process.... While it would in that case not be infringed by anything but the product of the machine or of the process, it might be an important protection....

*Buono*, 77 F.2d at 279. In particular, Judge Learned Hand foresaw important product-by-process protections against infringement "if the machine or the process was used in another country and the product imported." *Id.* As noted, however, this claim format remained an exception to the general rule.

As product-by-process claiming became more common, the CCPA moved toward accepting product-by-process claims without a showing of necessity. In 1969, the court reversed a Board of Appeal's decision holding a product-by-process claim improper because the applicant could claim the invention without relying on the process. *In re Pilkington*, 411 F.2d 1345, 162 USPQ 145 (CCPA 1969). The court instead determined that the applicant had adequately described the invention in accordance with the requirements of section 112. *Id.* Thus, the court shifted the emphasis away from the necessity for product-by-process claiming and toward determining whether the claim adequately defines the invention. *Bridgeford*, 357 F.2d at 682–83.

In *Hughes*, the CCPA permitted product-by-process claims even though the applicant could describe the invention in structural terms. *Hughes*, 496 F.2d at 1219. The court regarded "true product claims" as broader in scope than product-by-process claims—a distinction which acknowledges the process as limiting the scope of the claim. Therefore, an applicant could claim a product in product-by-process terms as a hedge against the possibility that those broader product claims might be invalidated. *Id.* The court, however, continued to regard product-by-process claims as an exception to the general rule. *Id.* at 1218.

The overall effect of these cases made the product-by-process exception more available to applicants. The CCPA began to handle an increasing number of cases where applicants sought exclusive rights to an old or obvious product claimed by reference to a new process for its manufacture. *See, e.g., In re Avery*, 518 F.2d 1228, 186 USPQ 161 (CCPA 1975); *In re Fessmann*, 489 F.2d 742, 180 USPQ 324 (CCPA 1974); *In re Brown*, 459 F.2d 531, 173 USPQ 685 (CCPA 1972). The court uniformly followed the Supreme Court's rule. An applicant could obtain a process patent for a new, useful, and nonobvious process, but could not claim rights to a product already in the prior art by merely adding a process limitation.

As the PTO confronted more product-by-process claims, it encountered a daunting administrative task. In weighing patentability, the PTO lacked facilities to replicate processes and compare the resultant product with prior art. The CCPA recognized this difficulty:

As a practical matter, the Patent Office is not equipped to manufacture products by the myriad of processes put before it and then obtain prior art products and make physical comparisons therewith.

*Brown,* 459 F.2d at 535.[10] The PTO's administrative difficulty presented another reason that the CCPA continued to regard product-by-process claims as exceptions to the general rule. *Hughes*, 496 F.2d at 1218.

In assessing patentability, moreover, the PTO necessarily concentrated on discerning

USPQ 143 (CCPA 1967) (The claim referred to a "condensation product." The court found no product-by-process claim.); *In re Luck*, 476 F.2d 650, 177 USPQ 523 (CCPA 1973). Product-by-process claims, on the other hand, define the invention solely or primarily in terms of process. *See, e.g., In re Hughes*, 496 F.2d 1216, 182 USPQ 106 (CCPA 1974).

10. Infringement litigation, however, did not confront this administrative difficulty. In focusing on a single patent, a trial court could adduce evidence showing precisely the product resulting from the claimed process. Then a comparison with prior art products facilitated a judgment of validity in light of sections 102 and 103.

what product or products might result from the processes in the claim. To prevent an applicant from obtaining exclusive rights to an old product by merely claiming a new process, the PTO needed a practical administrative tool. This stress on the product was appropriate because "the invention so defined is a *product* and not a *process.*" *Bridgeford*, 357 F.2d at 682 (emphasis in original). This point of emphasis, however, did not deny that the process language in the claim was a defining limit of the product claim. Rather, the process limitation defined a product, not a process. Indeed, the court in *Bridgeford* called the process a claim limitation. *See also Brown*, 459 F.2d at 535; *Hughes*, 496 F.2d at 1218.

The CCPA, even in reviewing only for patentability, treated the claimed process as a limitation. In *Hughes*, for instance, the court clarified that the process defines and limits the scope of the claim. *Hughes*, 496 F.2d at 1218–19 (product claim was of a broader scope than product-by-process claims). In fact, if the process limitations of a product-by-process claim did not adequately define the invention, an applicant would fail to satisfy section 112. *See id.; Brown*, 459 F.2d at 535. In other words, the process is a defining limit.

The CCPA also explicitly acknowledged that the process operates as a limitation in infringement actions. In *Bridgeford*, the court stated:

> The policy of the Patent Office in permitting product-by-process type claims ... has developed with full cognizance of the fact that in infringement suits some courts have construed such claims as covering only a product made by the particular *process*. . . .

357 F.2d at 682 n. 5 (emphasis in original); *see also In re Hirao*, 535 F.2d 67, 69 n. 3, 190 USPQ 15, 17 n. 3 (CCPA 1976). In *Moeller*, the court stated:

> We think the rule is well established that where one has produced an article in which invention rests over prior art articles, and where it is not possible to define the characteristics which make it inventive except by referring to the

process by which the article is made, he is permitted to so claim his article, but is limited in his protection to articles produced by his method referred to in the claims.

117 F.2d at 568.

In sum, the PTO and the CCPA acknowledged product-by-process claims as an exception to the general rule requiring claims to define products in terms of structural characteristics. This exception, however, permitted an applicant to claim a product in process terms, not to acquire exclusive rights to a product already in the prior art. Though using only process terms, a product-by-process applicant sought rights to a product, not a process. Therefore, the applicant had to show that no prior art product anticipated or rendered obvious the product defined in process terms.

The PTO and the CCPA did not reason that the process was not a defining limit of the product. To the contrary, the process was the only way to define and limit—in sum, to claim—the product. *Hughes*, 496 F.2d at 1218. Thus, in both patentability actions before the CCPA and infringement actions before the Supreme Court or the regional circuits, the courts regarded the process language in product-by-process claims as limiting the claim. Indeed by definition in most cases, the product could not be claimed in any other terms.

This court, in its initial consideration of a product-by-process claim for patentability, acknowledged that process claim limitations define the product:

> Product-by-process claims are not specifically discussed in the patent statute. The practice and governing law have developed in response to the need to enable an applicant to claim an otherwise patentable product that resists definition by other than the process by which it is made. For this reason, even though product-by-process claims are limited by and defined by the process, determination of patentability is based on the product itself.

*In re Thorpe*, 777 F.2d 695, 697, 227 USPQ 964, 966 (Fed.Cir.1985).

■ The entire history of product-by-process claims suggests a ready explanation for the apparent difference of view about treatment of those claims during *ex parte* administrative proceedings and during litigation. This court already distinguishes treatment of claims for patentability before the PTO from treatment of claims for validity before the courts. *In re Zletz*, 893 F.2d 319, 321, 13 USPQ2d 1320, 1322 (Fed.Cir.1989). This court permits the PTO to give claims their broadest reasonable meaning when determining patentability. *Id.; see also J.P. Stevens & Co. v. Lex Tex Ltd.*, 747 F.2d 1553, 1566, 223 USPQ 1089, 1098 (Fed.Cir.1984), *cert. denied*, 474 U.S. 822, 106 S.Ct. 73, 88 L.Ed.2d 60 (1985). During litigation determining validity or infringement, however, this approach is inapplicable. *Zletz*, 893 F.2d at 321; *DeGeorge v. Bernier*, 768 F.2d 1318, 1322 n. 2, 226 USPQ 758, 761 n. 2 (Fed.Cir.1985). Rather the courts must consult the specification, prosecution history, prior art, and other claims to determine the proper construction of the claim language. *See, e.g., Tandon Corp. v. United States Int'l Trade Comm'n*, 831 F.2d 1017, 1021, 4 USPQ2d 1283, 1286, 5 Fed.Cir. (T) 129 (1987). Thus, accommodating the demands of the administrative process and recognizing the capabilities of the trial courts, this court treats claims differently for patentability as opposed to validity and infringement. The PTO's treatment of product-by-process claims as a product claim for patentability is consistent with policies giving claims their broadest reasonable interpretation. The same rule, however, does not apply in validity and infringement litigation. In any event, claims mean the same for infringement and validity. *See, e.g., Senmed, Inc. v. Richard–Allan Medical Indus.*, 888 F.2d 815, 818 n. 7, 12 USPQ2d 1508, 1511 n. 7 (Fed.Cir.1989); *Kimberly–Clark Corp. v. Johnson & Johnson*, 745 F.2d 1437, 223 USPQ 603 (Fed.Cir.1984).

■ Moreover, accepting Atlantic's invitation to ignore the process limitations in the '204 patent's product-by-process claims would require this court to disregard several other mainstay patent doctrines. For instance, Atlantic in effect invites this court to discount the significance of excluding claim limitations from infringement analysis. *See, e.g., Continental Paper Bag Co. v. Eastern Paper Bag Co.*, 210 U.S. 405, 419, 28 S.Ct. 748, 751, 52 L.Ed. 1122 (1908) ("[T]he claims measure the invention."). This court has repeatedly stated that infringement requires the presence of every claim limitation or its equivalent. *See Pennwalt Corp. v. Durand–Wayland, Inc.*, 833 F.2d 931, 935, 4 USPQ2d 1737, 1739–40 (Fed.Cir.1987) (in banc), *cert. denied*, 485 U.S. 961, 108 S.Ct. 1226, 99 L.Ed.2d 426, *cert. denied*, 485 U.S. 1009, 108 S.Ct. 1474, 99 L.Ed.2d 703 (1988); *Perkin–Elmer Corp. v. Westinghouse Elec.*, 822 F.2d 1528, 1533, 3 USPQ2d 1321, 1325 (Fed.Cir.1987); *Lemelson v. United States*, 752 F.2d 1538, 1551, 224 USPQ 526, 533 (Fed.Cir.1985). An accused infringer can avoid infringement by showing that the accused device lacks even a single claim limitation. *See, e.g., Corning Glass Works v. Sumitomo Elec. U.S.A.*, 868 F.2d 1251, 1259, 9 USPQ2d 1962, 1968 (Fed.Cir.1989). Thus, ignoring the claim limits of a product-by-process claim would clash directly with basic patent principles enunciated by the Supreme Court and this court.

In addition, Atlantic's invitation to disregard the claim limitations also would require this court to determine infringement by comparing an accused product with an embodiment of the claims, not the claims themselves. This court has repeatedly emphasized that infringement analysis compares the accused product with the patent claims, not an embodiment of the claims. *See, e.g., Datascope Corp. v. SMEC, Inc.*, 879 F.2d 820, 824, 11 USPQ2d 1321, 1323 (Fed.Cir.1989); *SRI Int'l*, 775 F.2d at 1121; *Intervet Am. v. Kee–Vet Labs.*, 887 F.2d 1050, 1055, 12 USPQ2d 1474, 1478 (Fed.Cir. 1989). Thus, Atlantic's invitation would require this court to directly ignore basic patent principles.

In light of Supreme Court caselaw and the history of product-by-process claims, this court acknowledges that infringement analysis proceeds with reference to the patent claims. Thus, process terms in prod-

uct-by-process claims serve as limitations in determining infringement.

In so holding, this court acknowledges that it has in effect recognized another reason to regard product-by-process claims as exceptional. This court recognizes that product-by-process claims will receive different treatment for administrative patentability determinations than for judicial infringement determinations. This difference originated with the Supreme Court's *BASF* rules—a difference this court endorsed as recently as 1985. *See Thorpe*, 777 F.2d at 697.

This court, therefore, rejects Atlantic's invitation to ignore the process limitations in its product-by-process claims. This court's infringement rules do not require reversal of the district court's non-infringement finding regarding the Sorbothane process. Neither does this court disturb the PTO's present practice for assessing patentability of product-by-process claims.

### IV. Lost Profits

The district court determined that Faytex's sale of Surge innersoles did not constitute willful infringement of the patent. The court thus declined to award enhanced damages. The court assessed damages at $68,000 based on a lost profits valuation.

The district court erred in calculating lost profits. While a market share approach may be appropriate here, the district court did not properly apply this approach. It merely assumed that Faytex was the only other supplier of innersoles and that Atlantic would have made all of Faytex's sales. However, the district court also held, and this court agrees, that Sorbothane innersoles did not infringe. Faytex also sold non-infringing Sorbothane innersoles. Atlantic is not entitled to lost profits on Faytex's sales of Sorbothane innersoles. Moreover, the record contains no evidence that Atlantic would have made both Surge and Sorbothane sales.

Thus, this case does not involve a two-supplier market which would justify the assumption that the patent owner would have made all the infringer's sales. *See*

*State Indus. v. Mor–Flo Indus.*, 883 F.2d 1573, 1578, 12 USPQ2d 1026, 1029 (Fed.Cir. 1989), *cert. denied*, 493 U.S. 1022, 110 S.Ct. 725, 107 L.Ed.2d 744 (1990). The district court, on remand, will recalculate appropriate damages using a permissible market share approach, assuming market share analysis is appropriate, if the patent is determined to be valid.

### COSTS

As a sanction for casting unsupported and unsupportable allegations that Atlantic filed a frivolous appeal, this court charges costs to Faytex.

VACATED–IN–PART, AFFIRMED–IN–PART, and REMANDED.